**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a New Mexico non-profit corporation, KLAMATH SISKIYOU WILDLANDS CENTER, CASCADIA WILDLANDS PROJECT, OREGON NATURAL RESOURCES COUNCIL, Oregon non-profit corporations, and ENVIRONMENTAL PROTECTION INFORMATION CENTER, a California non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DIRK KEMPTHORNE, Secretary of the U.S. Department of Interior, and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Interior,<br><br>Defendants. _____/ | No. C 06-04186 WHA<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this Endangered Species Act case, this order reviews a finding by the United States Fish and Wildlife Service that listing the Siskiyou Mountains salamander and Scott Bar salamander as "threatened" or "endangered" is not warranted. Plaintiffs, a group of conservation organizations that filed the original petition to the Service, have moved for summary judgment. Defendants Dirk Kempthorne and the Service have filed a cross-motion for

summary judgment. For the reasons stated below, this order **GRANTS** plaintiffs' motion and **DENIES** defendants motion. The Service must issue a new 90-day finding by **MARCH 23, 2007.**

## STATEMENT

### 1.   ENDANGERED SPECIES ACT AND REQUIRED 90-DAY FINDING.

The Endangered Species Act defines an "endangered species" as one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. 1532(6). A "threatened species" is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. 1532(20). Once a species is listed as endangered or threatened, the species is entitled to a number of statutory protections designed to ensure its survival and recovery.

Section 1533 creates the procedures for determining endangered or threatened species. Private individuals may petition the Service to list species as either threatened or endangered. When the Service receives a petition to list a species, it has 90 days to determine whether the "petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. 1533(b)(3)(A). "Substantial information" is "the amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. 424.14(b).

The Service must make endangered or threatened species determinations based on any of five factors: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting its continued existence. 15 U.S.C. 1533(a)(1). Any one of the five factors may support a listing determination. *See Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1075 (9th Cir. 2006).

If the Service concludes in its 90-day finding that the petition presents "substantial information," the agency must conduct "a review of the status of the species concerned" to determine whether listing the species is "warranted." This status review must be concluded

within 12 months of the agency's receipt of the petition. If, at the 12-month finding stage, the agency concludes that such a listing is "warranted," it must publish a proposed rule in the Federal Register listing the species. Within 12 months of publishing the proposed rule, and after considering public comment and all relevant evidence, the agency must make a final decision whether to adopt a final rule listing the species. 16 U.S.C. 1533(b)(3)(B), (b)(5).

If, however, the Service concludes in the 90-day finding that a petition does not present substantial information indicating that a listing may be warranted, the finding must be published in the Federal Register. A negative 90-day finding may be challenged in federal court. 16 U.S.C. 1533(b)(3)(A), (b)(3)(C)(ii).

**2. THE SISKIYOU MOUNTAINS SALAMANDER AND SCOTT BAR SALAMANDER.**

The Siskiyou Mountains salamander (*Plethodon stormi*) is a small woodland salamander first described as a species in 1965. In 2005, genetic analyses conducted on the Siskiyou Mountains salamander recognized the Scott Bar salamander (*Plethodon asupak*) as a distinct species. Both species are medium-sized, slender-bodied salamanders with short limbs. They are brown in color with a lighter brown dorsal stripe and an array of white flecks on their sides and limbs (AR 64). Because the Scott Bar salamander was only recently identified as a separate species, the scientific research is applied by both parties to both species.

The salamanders' habitats overlap. The Siskiyou Mountains salamander's habitat covers a range of approximately 337,037 acres in southwestern Oregon and northern California. The Scott Bar salamander is found in 68,438 acres of Siskiyou County, California. Within these ranges the salamanders dwell in rocky soils and talus outcrops, spending most of their lives underground. Being "lungless," they must breathe through their skin and require constant moisture (*id*. at 24, 63–65, 68, 1199).

Plaintiffs submitted a petition to list the Siskiyou Mountains salamander as "threatened" or "endangered" under the Endangered Species Act on June 16, 2004 (*id*. at 2). After receiving no timely response from the Service, plaintiffs sued the Service for failing to make a finding regarding the petition within the requirements of the Section 4 of the ESA. *See Center for*

3

*Biological Diversity v. Norton*, Civ. No. 05-11311-BR (D. Or.). The parties reached a settlement agreement requiring the Service to submit a 90-day finding on the petition to the Federal Register by April 15, 2006, and, pending a positive finding, submit a 12-month finding by January 15, 2007 (Parties' Stipulated Settlement Agreement (Dec. 28, 2005) (Plaintiff Ex. H at ¶ 1)).

On April 17, 2006, the Service made its 90-day finding, concluding that the petition did not "present substantial scientific or commercial information" to warrant the listing of the salamanders (AR 63). Plaintiffs filed the instant suit to vacate the determination and order the Service to complete a status review and render a 12-month finding. Plaintiffs and the Service subsequently filed the instant cross-motions for summary judgment.

**ANALYSIS**

Although the ESA provides for judicial review of a negative 90-finding, it lacks a standard of review. Thus, the Administrative Procedure Act governs the standard and scope of judicial review for administrative decisions. *Pac. Coast Fed. of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (noting that "[a]gency decisions under ESA are governed by the Administrative Procedure Act"). Under the Administrative Procedure Act, the applicable standard of review is whether the agency's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A); *Pac. Coast*, 265 F.3d at 1034. In applying the "arbitrary or capricious" standard, the reviewing court examines whether the agency considered the relevant factors, articulated a rational connection between the facts found and the choice made, and whether there was a clear error of judgment. *See Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 585–59 (9th Cir. 2005). A court's review is normally limited to the administrative record consisting of the information before the agency at the time it made its decision. *Portland Audubon Soc'y v. Endangered Species Comm'n*, 984 F.2d 1534, 1548 (9th Cir. 2001).

Plaintiffs contend that the Service arbitrarily and capriciously issued the negative 90-day review. Specifically, plaintiffs allege that the Service: (1) applied the wrong standard; (2) erred in its evaluation of scientific information; (3) relied on uncertain regulatory mechanisms; and (4) erred by failing to evaluate whether the salamanders may be threatened or endangered throughout a significant portion of their range, or whether a distinct population segment may be threatened or endangered.

### 1.  APPLICATION OF APPROPRIATE STANDARD OF REVIEW.

Plaintiffs first contend that the Service improperly relied on an elevated standard to determine that the petition did not present substantial information. The Service contends that it faithfully applied the relevant standard. The parties agree on two important threshold issues. *First*, they agree that the appropriate standard the Service should apply asks "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. 1533(b)(3)(A). "Substantial information" is "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. 424.14(b)(1). *Second*, the parties agree that it would be wrong for the Service to require a petition to demonstrate "conclusive evidence" that the petitioned action was warranted. The parties do not dispute decisions holding that a "conclusive evidence" standard is inappropriate on a 90-day review. Indeed, the Service has been reversed by other district courts for using such a higher standard. *See*, *e.g.*, *Center for Biological Diversity v. Morgenwick*, 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004); *Moden v. United States Fish & Wildlife Serv.*, 281 F. Supp. 2d 1193, 1203 (D. Or. 2003). This order holds that the Service has, once again, arbitrarily and capriciously applied a more stringent standard than whether a "reasonable person" would find that the proposed action "may be warranted."

As an initial matter, internal agency documents support plaintiffs' contention that a more stringent standard was, indeed, applied. Two internal Service memoranda include the

5

statement: "Paul: Need a strong likelihood that it may be warranted to meet standard" (AR 58, 62). One of the memoranda explains this statement (AR 62):

> This "strong likelihood" standard definitely changes how far the inferences made in the initial draft can stack up before falling apart. As I've mentioned elsewhere in this message, much of the information on these species is equivocal, and could be used to (weakly) support different conclusions re population status/trends. I contend that there is NO interpretation that is strongly supported by the information currently available for these species. . . . [T]he guidance in Paul's point here suggests that the Service interpretation would therefore be that the threat has not been substantially supported.

At oral argument, the parties clarified that those memoranda were written after a draft 90-day finding had been circulated. That draft had found that listing the salamanders "may be warranted."

The Service contends that this reference to "strong likelihood" simply clarifies the meaning of the "may be warranted" standard. This order cannot agree. The author of the quoted memorandum applied the "strong likelihood" standard to conclude that equivocal evidence, meaning a submission admitting of more than one interpretation, was insufficient as a matter of law inasmuch as it would not rise to the level of a strong likelihood. This was wrong. A reasonable person could find that an action "may be warranted" even in the face of evidence cutting multiple ways.

The finding and the record also independently demonstrate that the Service did not faithfully apply the "may be warranted" standard. The Service correctly noted at oral argument that the 90-day finding cited and quoted the relevant standard. But merely quoting the relevant standard does not mean it was properly applied. As plaintiffs point out, the finding uses ambiguous language by stating, for example, that "the impact of clear-cutting on salamanders may be temporary," that the effects of habitat disturbance "may impact local abundance and viability," and that "tractor yarding may disturb" the salamanders' habitats (AR 66–68). The "may be warranted" standard, however, seems to require that in cases of such contradictory evidence, the Service must defer to information that supports petition's position. It would be

6

1  wrong to discount the information submitted in a petition solely because other data might
2  contradict it.  At this stage, unless the Service has demonstrated the unreliability of information
3  that supports the petition, that information cannot be dismissed out of hand.  Here, the Service
4  reached its ultimate conclusion because much of the evidence was not conclusive.  This was
5  arbitrary and capricious.  A failure to apply the "non-stringent" standard "renders [the
6  Service's] findings and ultimate conclusion flawed." *Morgenwick*, 351 F. Supp. 2d at 1141.
7  This order remands to the Service to apply the standard properly in a new 90-day finding.  Next,
8  this order addresses other issues raised by plaintiffs that will guide the Service when it conducts
9  a new 90-day review.

### 2. ASSESSMENT OF THREATS IN SCIENTIFIC EVIDENCE.

11  Plaintiffs also contend that the Service arbitrarily and capriciously concluded that the
12  petition failed to provide substantial information regarding the threats to salamander habitat.
13  Specifically, they argue that there was sufficient scientific information presented that a
14  reasonable person would find that listing "may be warranted."  This order agrees that on this
15  record, plaintiffs have demonstrated substantial information presented by various scientists that
16  logging and other activity threatened the salamanders.

17  The petition alleged that logging was considered the "princip[al] threat" to the continued
18  existence of the salamander.  According to the petition, the salamander required a combination
19  of "late-successional forest conditions, talus substrate, and an appropriate climactic setting."
20  Logging would alter "stand microclimate through canopy removal" and "compact[] or
21  otherwise impact[] talus substrates," thereby rendering the habitat unsuitable for the
22  salamander.  The petition noted several other threats to the salamander's habitat, including road
23  building, mining, recreation, construction of a dam, fires, and global warming (AR 4).

24  The Service's finding recognized that logging, wildfire, and other habitat disturbances
25  "may impact local abundance" of the salamander by "altering the microclimate within stands
26  that support" the species.  The finding, however, concluded that the petition and other
27  information did not provide substantial information that the salamander's continued existence

7

1  was threatened by the present or threatened destruction, modification, or curtailment of the
2  species' habitat. Specifically, although extensive logging had occurred in the region, "the
3  extent of habitat loss ha[d] not been quantified." Additionally, the Siskiyou Mountains
4  salamanders and Scott Bar salamanders existed to "some extent" in clear-cuts, second-growth
5  stands, burned areas, and naturally open habitats. This suggested that although timber harvest
6  and wildfire could reduce habitat quality, they did not result in the "extirpation of populations."
7  The rate and extent of timber harvests had declined dramatically in the past 30 years and it was
8  anticipated that the rate would remain at the present levels in the foreseeable future. Finally,
9  though it was "reasonable to assume" that high-intensity wildfire "may have a negative impact
10 on salamander habitat and populations," the Service had "no information and the petition
11 provided no information to support a determination that fire [was] a substantial risk" (AR 68).

12 This order agrees with plaintiffs that there were several problems with the 90-day
13 finding. For example, the Service improperly dismissed a key study on which the petition
14 relied. That study, conducted by Lisa Ollivier of the United States Department of Agriculture
15 Forest Service, had found that the Siskiyou Mountains salamanders and Scott Bar salamanders
16 were closely associated with characteristics of mature forests, "such as closed canopies, large
17 tree diameters, and a mossy ground cover layer." The petition, based on the Ollivier study,
18 "infer[red] that removal of forest cover would result in habitat conditions unsuitable for the
19 salamanders." The Service discounted the Ollivier study in light of subsequent studies
20 conducted by private and California Department of Fish and Game biologists. Those
21 researchers had "conducted numerous surveys and detected Siskiyou Mountains salamanders in
22 previously logged sites." The finding relied on those studies to "demonstrate that salamander
23 populations persist at sites that have been logged" (AR 67).

24 For purposes of the 90-day review, the post-Ollivier studies should not have been used
25 to conclusively contradict the Ollivier study because, as the finding itself noted, the later studies
26 "followed no sampling design and [could not] be used to infer a lack of impacts caused by
27 logging." Moreover, a letter submitted to the Service by Dr. Hartwell H. Welsh, Jr. compared

8

the methods used by the surveys. According to Dr. Welsh, a research wildlife biologist, the Ollivier study intensively studied small areas and was "more likely to detect the presence of self-sustaining populations present at a given stand." In contrast, the state survey was "extensive" and "conducted across a much wider area" which "greatly increas[ed] the chances of detections," and was "more likely to detect migrating individuals that may be crossing areas of generally unsuitable habitat in search of better conditions" (AR 1848–49).

It is true that generally, a court reviewing an agency decision must be "deferential to the agency's expertise in situations . . . where resolution of this dispute involves primarily issues of fact." *Ariz. Cattle Growers' Assoc. v. United States Fish and Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (internal quotations omitted). Here, however, there was at least contradictory information regarding the salamanders' close association with mature forests. The Service should have determined whether reliable evidence supported the petition's position. The Ollivier study satisfied the "substantial information" standard in that respect. The finding did not explain why the Ollivier study was wrong, only that it was contradicted. Dismissal of the Ollivier study further evidences the Service's failure to properly apply the "may be warranted" standard.

The Service's principal contention in opposition is that there was a "paucity" of scientific evidence supporting plaintiffs' "chain of inferences" (Opp. 31). Plaintiffs, however, did present evidence in their petition that supported each of the important links in the theory. *First*, there was evidence that salamanders were closely associated with old-growth and mature forests. This was demonstrated, for example, by Dr. Welsh's comments and the Ollivier study (AR 67). *Second*, there was evidence that the salamanders habitats were threatened by logging. One study, for example, stated that "[c]atastrophic loss of canopy can extirpate the animals from a given site" (AR 416). Dr. Welsh also stated that "[t]he literature is clear on plethodontid salamanders both east and west that they do not occupy clearcuts by choice and when it happens the populations become depressed and many species disappear" (AR 43). *Third*, the finding itself noted that extensive logging had occurred throughout the salamanders' ranges and was

9

1  "likely to continue on private lands" (AR 67). Accordingly, there was evidence in the record
2  that plaintiffs' petition was more than a unsupported "chain of inferences." The finding did not
3  adequately explain how the petition's evidence fell short.

4  The Service additionally contends that the other information regarding the threats to the
5  salamanders was "speculative and equivocal." For example, the Service's opposition states that
6  "[w]hile one older study characterized optimal habitat as old-growth forest stands on
7  north-facing slopes, more recent studies found the species in all forest-age classes and on all
8  slope aspects" (Opp. 14). But the Service did not, in either its opposition or the finding, explain
9  that the older study was unreliable or otherwise wrong. *See Morgenweck*, 351 F. Supp. 2d at
10 1142 ("While some of the information in the Petition may have been 'outdated' as defendants
11 suggest, the information was not necessarily inadequate or incorrect.").

12 The Service relies on other inconsistencies in the evidence to justify its conclusion. The
13 Service points to studies that related salamander species were found to persist following
14 clear-cutting. The Service does not dispute, however, that those studies also demonstrated that
15 the salamanders were significantly less abundant in clear-cut areas and younger forests than
16 they were in older forests (AR 66). Moreover, in criticizing some of the studies relied upon by
17 the Service, Dr. Welsh stated (AR 1849):

> [I]t is not accurate to assume that the presence of younger animals at a site constitutes a reproducing population, and it is an even greater mistake to assume that these detections in fact mean that the species as a whole does not require interior forest conditions for its long-term well-being. If that were indeed the case, it would be the first plethodontid salamander species ever to liberate itself from forest-associated micro-habitats.

22 Dr. Welsh's evaluation of some of the studies relied upon by the Service calls into question the
23 finding's statement that the impact of clear-cutting on salamanders "may be temporary." The
24 fact that other studies merely suggested that salamanders could exist in clear-cut and young
25 forests did not render Dr. Welsh's comments — or any other evidence submitted by plaintiffs
26 — not "substantial."

10

1    At the 90-day stage, the question is not whether the designation *is* warranted, only
2 whether it *may* be. The standard requiring consideration of whether a "reasonable person"
3 would conclude that action "may be warranted" contemplates that where there is disagreement
4 among reasonable scientists, then the Service should make the "may be warranted" finding and
5 then proceed to the more-searching next step in the ESA process. Indeed, an early outline of the
6 finding and a preliminary draft of the finding both concluded that concluded that listing the
7 salamanders may be warranted (AR 1846-46; AR 71).[1] On remand, if the Service again finds
8 that the threats to the salamanders would not justify further action, the Service must clearly
9 explain why the evidence that supports the petition is unreliable, incorrect, or otherwise
10 irrelevant. If certain facts such as the effect of logging roads on the salamanders remain
11 "unknown," the Service must explain why that uncertainty does not leave open the possibility
12 that listing "may be warranted."

### 3. CONSIDERATION OF REGULATORY MECHANISMS.

#### A. Existing Regulatory Protections.

15    Logging on federal lands in the salamanders' range has been regulated since 1994
16 pursuant to the Northwest Forest Plan. Under the plan, the "Survey and Manage" program is
17 designed to protect certain rare and uncommon old-growth dependent species in the plan area.
18 The Siskiyou Mountains salamander and Scott Bar salamander are both protected under the
19 Survey and Manage program. (The Scott Bar salamander was not originally named as a Survey
20 and Manage species but protections were extended once the Scott Bar salamander was
21 recognized as a separate species.) Accordingly, surveys for the salamanders must be conducted
22 before any ground-disturbing activity like timber-harvesting or road-building (AR 962, 1213).

---

[1] The Service contends that reliance on drafts is improper under *Center for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998). There, the Ninth Circuit held that the Service was "entitled to . . . change its mind." That decision is inapposite. This order only looks to the drafts as evidence that reasonable people could find that the petitioned action was warranted, not that the Service should never change its mind. Because the final finding did not adequately justify its conclusion, it is worth noting here that there was apparently disagreement within the Service during the 90-day review.

1      In 2004, the Forest Service and Bureau of Land Management eliminated the Survey and
2 Manage program. In August 2005, Judge Marsha Pechman in the Western District of
3 Washington held that the agencies' decision to eliminate the program violated the National
4 Environmental Policy Act and the ESA. *See Nw. Ecosystem Alliance v. Rey*, 380 F. Supp. 2d
5 1175 (W.D. Wash. 2005). In January 2006, Judge Pechman reinstated the Survey and Manage
6 program. *See Nw. Ecosystem Alliance v. Rey*, No. 04-844P, 2006 WL 44361, *1 (W.D. Wash.
7 Jan. 9, 2006). In December 2005, however, the Forest Service and Bureau of Land
8 Management announced plans to eliminate the Survey and Manage program again by
9 addressing the concerns in Judge Pechman's ruling. 70 Fed. Reg. 73,483 (Dec. 12, 2005).

10     The salamanders receive some state protection in California. The Siskiyou Mountains
11 salamander has been listed as threatened under the California Endangered Species Act since
12 1985. The California ESA protections have largely been applied to timber-harvest operations
13 on private timberlands that comprise approximately 10 percent of the Siskiyou Mountains
14 salamanders' ranges and 18 percent of the Scott Bar salamanders' ranges. In 2005, the
15 California Department of Fish and Game formally petitioned the California Fish and Game
16 Commission to delist the Siskiyou Mountains salamander under the California ESA. The Fish
17 and Game Commission is expected to rule on the petition on January 31, 2007 (AR 69).

18     The Scott Bar salamander currently receives no protection under the California ESA.
19 According to plaintiffs, the Department of Fish and Game has determined that the Scott Bar
20 salamander is not a protected species under the California ESA. That decision is being
21 challenged in California state court (Br. Exh. G).

22     The Service's 90-day finding held that federal regulations "currently provide substantial
23 protection for the Siskiyou Mountains salamander and Scott Bar salamander through the Survey
24 and Manage program." Additionally, the finding stated that "California regulations provide
25 substantial protection for the Siskiyou Mountains salamander on private lands." Thus, "the
26 Service consider[ed] the current Federal and State regulations adequate for both salamander
27 species." In short, "the petition and other information in [the Service's] files [did] not present

12

1 substantial information that these species are threatened at this time by the inadequacy of
2 existing regulatory mechanisms across all or a significant portion of their ranges" (AR 69).

### B. Evaluation of Regulatory Mechanisms.

Plaintiffs allege that the Service did not properly account for the uncertainty in the federal and state regulatory mechanisms. In their papers, plaintiffs do not contend that the federal and state protections for the salamanders are themselves inadequate. Instead, they contend that there is a high likelihood that the Survey and Manage program will be eliminated and that the Siskiyou Mountains salamander will be delisted from the California ESA. Plaintiffs maintain that the protections "have been or are in the process of being eliminated," and accordingly, that the regulatory mechanisms are inadequate due to the uncertainty of their continued existence. The Service attempts to rebut plaintiffs' argument by contending that predicting that a regulation will be eliminated cannot rise to the level of "substantial information."

Both parties' positions have some merit. When an existing regulatory mechanism is adequate under the ESA, a petitioner cannot simply speculate that the regulation may become inadequate because it is going to be eliminated. There, the Service would be justified in finding that there is no "substantial information" that the existing regulatory mechanism is inadequate. Conversely, however, it is possible that facts could be presented to the Service demonstrating that a particular regulation has an imminent likelihood of being eliminated. In that case, the "existing" regulatory mechanism could not be considered adequate because of the near-certainty that the regulation would have only short-lived efficacy. As plaintiffs note, it is the Service's policy that "[c]entral to this concept [of making a prediction about the future persistence of a species] is a prediction of future conditions, including consideration of future negative effects of anticipated human actions." 68 Fed. Reg. 15,100, at 15,107 (Mar. 28, 2003).[2]

---

[2] The decisions cited by the parties do not address directly whether an existing regulation can be considered inadequate solely because it is likely to be eliminated. *See Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 684 (D.D.C. 1997) (holding that it was improper for Service to merely "assert[] that . . . protections

13

This order does not decide whether there was enough information before the Service to constitute "substantial information" that the existing regulatory mechanisms were inadequate due to the possibility that they might be eliminated. This order notes that there seems to be a possibility that both federal and state protections *might* be eliminated. It is recognized, however, that agency and judicial action is difficult, if not impossible, to predict. On remand, the Service should take into account any new developments regarding the existing federal and state protections.

### 4. "SIGNIFICANT PORTION OF THE RANGE" AND DISTINCT POPULATION SEGMENT ANALYSES.

As discussed above, a species may be listed as endangered if it is "in danger of extinction throughout . . . a significant portion of its range." 16 U.S.C. 1532(6). A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout . . . a significant portion of its range." 16 U.S.C. 1532(20). Here, the petition requested that the Service: (1) consider whether either the Siskiyou Mountains salamander or Scott Bar salamanders should be listed as threatened or endangered throughout a significant portion of its range and (2) determine whether a distinct population segment ("DPS") of the species should be listed (AR 2).[3] Plaintiffs contend that the Service erred by failing to conduct "significant portion of the range" analyses and DPS analyses. Defendants do not deny that those analyses were not done. Defendants instead contend that such analyses were not required in light of the lack of substantial information regarding the salamanders' habitat and in support of the five listing factors.

---

exist, and make[] no attempt to analyze past or present data to determine whether these mechanisms are effectively protecting the Lynx population from continued destruction"); *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 25–26 (D.D.C. 1996) (finding it improper for the Service to rely on a promised action as an *existing* regulatory mechanism); *Sw. Ctr. for Biological Diversity v. Babbitt*, 939 F. Supp. 49, 52 (D.D.C. 1996) (holding that Service "cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record).

[3] The term "distinct population segment" comes from the ESA, which explains that "'species' includes any subspecies of . . . wildlife . . . and any distinct population segment of any species of . . . wildlife which interbreeds when mature." 16 U.S.C. 1532(16).

In *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001), the Ninth Circuit explained that a species "can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." The Service rests on portions of the record that indicate that "little is known about [the species'] historic distribution" and that "the extent of habitat loss has not been quantified" (AR 12; AR 68). Plaintiffs point out, however, that there is other information in the record that "10% of potential habitat on the Applegate Ranger District was clearcut between 1980–1990" and that "[p]rivate lands (20%) within the range of the species are not expected to provide much, if any, suitable habitat for the species" (AR 14–15). Moreover, the finding itself noted that "extensive logging has occurred in the Siskiyou Mountains salamander and Scott Bar salamander habitat for over one hundred years" (AR 68). Thus, there is at least some evidence that there are "major geographical areas" where the salamander used to be, but no longer remains, viable. In this case, whether the evidence meets the non-stringent "substantial information" standard is a determination for the Service to make — the Service having failed to do so the first time.

## CONCLUSION

In light of the foregoing, this order **VACATES** the 90-day finding and **REMANDS** to the Service to issue another 90-day finding in accordance with this order. Specifically, the Service must: (1) correctly apply the "substantial scientific or commercial information" standard; (2) reevaluate the scientific information presented under the appropriate standard; (3) reconsider its prior finding with respect to the existing regulatory mechanisms and consider developments in the efforts to eliminate those protections; and (4) evaluate whether the salamanders or any DPS may be threatened or endangered throughout a significant portion of their range. This must be completed by **MARCH 23, 2007**. Because the Service did not perform the "significant portion of

15

the range" analysis in the first finding and must do so now in the first instance, this order does not reach the issue raised by plaintiffs that the appropriate remedy is to order the Service to undertake the 12-month review immediately.

**IT IS SO ORDERED.**

Dated: January 19, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE